Thank you, Your Honor. My name is Jimmy Monteclaro, and I'm the attorney for the petitioner Nagi Atta. We sought review of the decisions of the IJ and the BIA, principally because at the IJ, the IJ failed to give petitioner the opportunity to cross-examine the translator of Exhibit 6. The crucial date on this hearing, Your Honors, is June 27 of 2002. The proceeding started 1999. So three years has passed, and it was about to conclude on that day, the presentation of the petitioner's evidence. But in that hearing, the IJ asked the interpreter to read Exhibit A, which was in Arabic language. That's Exhibit 8, as in the number 8, or Exhibit 8. No, Exhibit 6, Your Honor. 6. 6, which is a personal ID, identification of the petitioner. And she was asked by the court to read the Arabic into English. And when she came to the word describing the religion, she said, Muslim. And then she changed it, and she said, Christian. And then she made a question mark, Muslim. And then she finally concluded, Christian. Now, up to that point, from the time we started the hearing, up to that point, there was no issue at all as to the religion of the petitioner. All documents and testimony of written letters from priests show that he was a Christian. Now, the judge, upon hearing from the interpreter, that the interpreter had hesitation or, as counsel described it, difficulty, but we call it like a hesitation. But at that point, the interpreter was sure of her final interpretation, which was Christian. And prior to that, another interpreter, upon the request of the same judge to read the same exhibit, a previous interpreter with a different name, interpreted without hesitation or without any doubt that the religion was Christian. Now, the judge, on June 27, 2002, was saying that she had some ‑‑ she was wavering about credibility. And she asked the government lawyer to make it simpler, to make her ‑‑ to make a decision simpler. I think she said, I am giving you opportunity to get a DHS translation of the religion. And ‑‑ There's nothing wrong with that, is there? I'm sorry, Your Honor. There's nothing wrong with that. There was nothing wrong with that. But we wanted to have the case resolved on that day. And I even suggested that we can ask the interpreter to, again, look and read the document and translate it. But the judge said, in that case, you will be making the translator your witness. And if she is your witness, then she cannot go on interpreting. And that will delay the proceeding. So I told the judge, okay, I agree with the suggestion of the judge for DHS to have a translation. And the government was given four months to do that. And it was set for October 2002. Come October, the government lawyer was not prepared. They did not make a translation. And so the judge gave them another ‑‑ they gave them up to April of 2003 to come up with the translation, and which they did, in fact, on April 3, 2003, produce a translation which stated that the religion was Muslim and not Christian. Let me just ask you this, because the BIA certainly thought it was important that there was a translation that said it was Muslim that was contrary to some of the other translations. But as I read the I.J.'s opinion, the court says, or the I.J. says, there's inconsistent evidence, so I'm not going to rely on the documents. Instead, I'm going to look at the testimony. And it was the testimony that said he was tortured, and then he ‑‑ the next day he went to work, and then he went back to the same security office that had tortured him and to report the break-in to the café that she found inherently implausible. And that's what she seemed to rely on in determining, making the adverse credibility determination. Why were those findings erroneous? Those findings would be erroneous, Your Honor, because we have to look at the actions of Nagi Atta in the light of his Christian religion and practices. We have two kinds of Christians, Your Honor, the non‑practitioning Christians who don't care about Christianity. And there are practicing Christians who cared for Christianity and practiced the religion in accordance with the Bible. And the Bible, Your Honor, I was reading last night, how ‑‑ because this is the one that guided Christians, including Nagi. And Nagi Atta is a daring, bold Christian who practiced his religion. In fact, even though the crime for corruption ‑‑ Mr. Guadagno, you're making a jury argument. Yes. Okay. Please answer the question that Judge Ikuda asked. Isn't there a separate ground for finding inconsistency with substantial evidence? Yes, Your Honor. You think there is? Yes, Your Honor. Because the judge could not believe that a person after three days of detention could go back to his normal life and practice Christianity. He testified he was tortured. Yes, Your Honor. He was hung upside down. He was hit on the head. He was struck with sticks. He was whipped on the soles of his feet. And then after getting out of detention, the next morning he went to work. I mean, that has nothing to do with whether you're a devout Christian or not. She says that's just inherently implausible. The second thing she said was implausible was he then went and reported the break-in to the café to the same security force that had tortured him. And I, again, I don't think that's a question of whether he's a devout Christian or not. She just found that was inherently implausible. So for us to overturn that, we'd have to say we're compelled to say she was wrong, that anyone would not think that was implausible. Why isn't that implausible? Why was she wrong? There was a misstatement of the judge, Your Honor. The statement of, if we review the records, the statement of Nageata was he reported the second incident. He reported it to the police, not to the security State. The security State was the one that got him on the first incident. The second incident. And did he ever go to the security after talking to the police? Or he went to the police and then he went to the security force? Yeah. He went to the police and the police would not entertain him because the complaint was about conflict on religions among Christians and Muslims. And they said they have no jurisdiction. You should go to the State security, which is in charge of that. And did he go to that? And then he went to that because that's his only recourse. But they were the ones who had been detained and tortured him. That was what she said. The same, but not all of State security are that, you know. They're not the same person. It so happened that when he went there, the State security that personally that was also responsible on the first incident was there and caused him to have been to be detained for another three days. And so he was detained for another three days. But he didn't, after the second incident, he didn't go. I have 30 seconds, Your Honor, if I may do that for a rebuttal. I have 30 seconds. You want to reserve that? Yes, Your Honor. Thank you. Good morning. May it please the Court. John Hogan on behalf of the Attorney General of the United States. This case turns on the credibility of whether Mr. Atta is a Christian. The question then becomes, does the record compel that he's telling the truth? Now, reasonable minds might differ based on the documentary evidence and the testimony, but that's the problem. He loses if that's the standard. The standard is actually. This isn't a credibility determination in the sense that the trier of fact, who still had heard the witness, said, I find this witness incredible because he was evasive in my questioning. He looked nervous whenever he got to a difficult point, and it seemed to me much of what he was saying is made up, and I just don't find him credible. This is a case where the lack of credibility turns on the substance of what was said rather than the way in which it was said. And also outside evidence, which the administrative judge found, undermined his credibility. That's exactly right, Your Honor, and that's part of the problem here, that perhaps reasonable minds might differ because it's not just about his demeanor or something like that. It's about what he actually said over a course of almost four years of hearings seven different times, and then he submits several different documents that say several different things several different times. Mr. Hogan, let's take those two points that Judge Ikuda mentioned a moment ago as whether there's substantial evidence upon which to make a credibility finding adverse to Mr. Atta. Number one, that after being detained and beaten in the police station, she found it incredible. He went back to work the next day. What was she using for her parameters of judgment as to what would be credible and believable? Her experience as an employee of the Federal Government? Or why does she say if he was beaten, he could not go back to work the next day? Well, for a couple of reasons. One, the immigration judge, as this Court tells, is in the best position to understand and know what's happening based on the testimony. What was she understanding about the beating which would require him to go to either a hospital or stay home? What were the injuries that she saw inflicted during the police interrogation that would incapacitate him from going to work the next day? The fact that there were none, based on he testifies to a severe beating. There were none that can say you weren't tortured, right? But if that's her position, then it's perfectly reasonable he goes back to work. But he testified. But if she's finding that he was beaten, right, that he was tortured or was persecuted, what injuries did she find? Where in the record do we know? I mean, did he have a muscle strain in his low back? Did he have a contusion in his knee? Where is the evidence that he suffered such injuries as would incapacitate a man from opening a café? It's not there, and it's Mr. Atta's burden. He testifies over three days. No, no, no, no, no. It's now our question whether there was substantial evidence from which you could say he suffered such injuries that a normal person would have stayed in bed or gone to the hospital. Fine. What were those injuries? Did he have a concussion? She says, I don't believe that a person who is detained for three days can go to work the next day. And she asked him this question, Your Honor, and he responded, I had to go to my shop to open it the next day. And he was the only man to open the shop. Right. But he was, I asked, I believe, Your Honor, were you hospitalized? No. And he testifies to three days of severe beatings and being hung upside down. A rational, normal person would think something might have happened to you, some kind of injury. But he goes to work the next day. That's one way to take a look at it, and the other is that he was really beat up, but he was the only man who could open his café, and he needed the money to live. Perhaps, Your Honor, but then what happens to him the day after is even more telling. He doesn't go to the, the fact that he goes to the police the next day. Now we're going to the second part. He did go to the police, not the security agency. I think we're all in agreement that there's a municipal police and there's a security agency. A security agency enforces Islam. The police enforce traffic tickets, let's say. So he goes to the police over here, and they say, we're not going to touch this. This is a religious dispute. Go to the security agency. He's got nowhere else to go to complain about the people who trashed his, the mujahideen who trashed his café. What is inherently improbable about him following what the police told him to do? The fact that he's going back to be allegedly beaten by the same people that did it. If it was the police. Did he go back to see the same people that beat him, or did he go to a security agency and see different people from the people who beat him? The best evidence in the record, Your Honor, is he goes to the security agency. And while there, the person that allegedly administered the beating three days before sees Mr. Atta, and they detain him for three more days where nothing happens. No physical injuries happened during those three days. So she says, I just don't believe you would have done that, a reasonable person would have done that. I don't believe you did it. It might be better for Mr. Atta if he goes to the police, and lo and behold, they're the people that beat him before. But she's making a finding that he didn't go to a security agency. Right. He goes to the police first. For the second incident. On the second time around. And she's making a finding, did she make a finding, he did not go to a security agency because no man in his right mind would go to where he'd just been detained and beaten? Right. And that's his testimonial evidence in conjunction with the documentary problems that the Court was. But under our case law, doesn't the I.J. have an obligation to give Mr. Atta the opportunity to explain this inconsistency or implausibility that she perceived? And he did, Your Honor. That was the very first hearing, excuse me, the first merits hearing. Two out of seven hearings total. For the next three years, no further evidence is presented by Mr. Atta regarding that beating. Most of the testimony is about his expert witness who has no personal knowledge of what happened to him in Egypt, just overall conditions. You say she did give him an opportunity to explain, and where is that in the record? Over and over again, Your Honor. When they come back to each of the new hearings, is there any new evidence to present? Are we on redirect or are we on cross-examination? No, no, that's not what we mean by opportunity to explain. The opportunity to explain has to focus the alien on what the I.J. perceives to be an inconsistency and then say, you said A over here, but B over here, or you've given testimony which is incredible and I'm bothered by this and I'm giving you an opportunity to explain why it is credible and why it is not incredible. I think that's what we mean. That's the record citation we'd like you to tell us about. And I've got about 30 citations. I don't have them. I'll get them for the Court, but I know what the judge does say, is when there's problems with the documents, what the judge tells them, look, I'm having problems with this testimony. You also have problems with documents. We can continue it or you can submit it today for the testimony. A generalized I'm having problems is not really sufficient under our jurisprudence. You have to give them you have to focus the alien on what is apparently the inconsistency or the deleterious testimony given, and then give them a chance to say, to explain. That's the portion of the record that's proposed, which we would be very obliged should you cite it to us. Your Honor, I don't I would not be able to do that for you right now, exactly, because most of the questions deal with the documentary evidence, because that's what most of the five hearings go to. Is there any reason that you can give us as to why the I.J. didn't let the aliens attorney voir dire or cross-examine the translator? We've had three translators saying Christian, Muslim, Christian, Christian, Christian, and this one, for the first time, comes up with Muslim, right? And so the defense attorney gets up or the petitioner's attorney gets up and says, I'd like to cross-examine that person to see whether she's really translating this right from the Arabic, and the judge says, no, I've had enough of this. What sort of due process is that? Well, I think, Your Honor, in the context, we need to look at it again. One, we have a three-and-a-half years of hearings. That's point one. Point two is Mr. Atta had basically two translators working for him. And that's the problem. That's all water under the bridge. Here's the translator which, after several continuances, the government has finally produced. They finally got an expert witness to tell them what they wanted. Right. And now he's saying what the government wants, and there's no cross-examination allowed? But the reason is not just the time, Your Honor. It's also that the translators Mr. Atta has used before, like, for instance, the birth certificate. The birth certificate takes three attempts by the same translator before ever it comes out that it says Christian on there. So the immigration judge has that in his background, that that's a problem, that you can't even get that right. Then the identity card, the first time that's talked about by the in-court interpreter. Let's get back to the issue. But that all the time. And that's the reason given by the judge, or that you can give me, why the judge couldn't say, all right, I'll give you three minutes to cross-examine. For this reason, Your Honor. You've had four years, he says, one. For two, you're presenting right when. But his witness had never been cross-examined. Correct, Your Honor. But the other evidence before the judge that day was Mr. Atta was submitting other evidence at that time to rebut the government's evidence. It was also submitted that day. And that evidence, the first one, was a birth registration. It didn't even have the child's name on it. The second evidence had four or five pages of Arabic, only one page of English. So what the judge was basically faced with is how much further do we continue to get someone else to say Christian, someone else to say Muslim, someone else to say Christian. But how would there have been a cross-examination of this witness? And on cross-examination, the witness said, well, I've been studying it a little more. But in light of all of these questions, and I think I made a mistake when I said that that word was Muslim. I'm checking it over now. I now realize I was wrong. And I, too, now say that this document says Christian. That would have been the end of the case, wouldn't it? It could have been, Your Honor. But the judge makes the point that you have been on notice since the prior October, and this was April. He was primarily concerned that the case had been going on too long, and he was prepared to despise it. Isn't that right? Basically, she said, I'm ready to decide the case now. We don't need any more evidence. Well, that's because, Your Honor, you had a prior interpreter in court calling into question what the words said, and now the government's evidence, and Mr. Atta himself submitting additional evidence that day to rebut the government's own evidence. Mr. Hogan, we take you by questioning over your time. Sorry. Thank you very much for your argument. Thank you. Mr. Monteclado, we'll give you a minute, because 19 seconds isn't too much. Thank you, Your Honor. By the way, were you the attorney at the hearing? Yes, Your Honor. All right. From the start to finish. So you're the one who wanted to cross-examine this translator and get a concession similar to which Brother Friedman had suggested. Yes, Your Honor. And, yeah, we just sought for fairness, Your Honor, to be able to cross-examine the translator, and we were denied. And also, I also sought to recall Nagi Atta to the witness stand in order to clarify the inconsistencies that was raised by the court, but he was also denied. Now, as to delay this, we have almost four years. The first session was somewhere in 1999, like October or November. But the judge, after that initial hearing, because she considered the hearing, I mean, the case as not expedited, she continued the case for another four years. A year and a half, for like 16 months. And so that was not the petitioner's fault. It was the judge who made that. And then the second hearing, the judge wanted to call it the first and second in the morning and the afternoon and the evening. You're really relating historical fact. One question, and then we'll let you go. Yes. Why did Atta go to the state security people who had imprisoned him and beaten him, if we're to believe him, after his place was trashed? Yes, Your Honor. What's your story on that? The story of that, Your Honor, there are three incidents. The first incident, the state security, Nagi Atta did not go to the state security for the first incident. He was accused for converting a Muslim into Christian, so he was apprehended by the state security. He was taken and brought to the state security. So it's wrong to say that he reported to the state security the first time. No, I thought it was after his place was trashed by the Muhaddin. Right. The second time, he went to the police, not to the state security. Right. And the police told him they had no jurisdiction. Right. He has to go to the state security. Now, why did he go to the state security? He didn't know that if he went there, he would be again tortured or apprehended. So he was following the advice of the police to him, and he had no other thing to do but to report what happened to somebody who could help him. And he didn't know that this same state security would be what was the same state security. Are you saying that when he went from the police, when the police told him they couldn't handle this and he went to the state security people who were handling this type of case, he didn't know at that time that the officer who he would see at the state security office was the same officer who had previously tortured him? Yes, Your Honor. Is that basically what you're saying? Yes, Your Honor. Okay. Thank you very much, Mr. Montecorio. Thank you, Your Honor. All right. The next case is Carlos Humberto Catalan, and that case has been dismissed pursuant to an agreement of the parties. The next case is United States v. Hugo Gutierrez Sanchez, and that's another brief.
judges: Bea, Ikuta, Friedman